The FIRST NATIONAL BANK AND TRUST COMPANY OF STILL-WATER, Appellee,

v.

Bill G. McKOWN, individually and d/b/a McKOWN INDUSTRIES; McKown Construction Company, Inc.; Sandra E. McKown; Central Bank and Trust of Tulsa, formerly Republic Bank and Trust Company, Defendants,

and

Oklahoma Fixture Company, an Oklahoma corporation, Appellant.

No. 79718.

Court of Appeals of Oklahoma, Division No. 4.

Sept. 21, 1993.

Certiorari Denied Dec. 23, 1993.

James R. Ryan, Conner & Winters, Tulsa, for appellant.

Dianne L. Smith, David R. Guthery, Guthery & Smith, Tulsa, for appellee.

TAYLOR, Presiding Judge.

In this appeal defendant Oklahoma Fixture Company ("OFIXCO") asks us to reverse the trial court's summary judgment in favor of plaintiff, The First National Bank and Trust Company of Stillwater, now Bancfirst ("Bank"). Bank claimed that OFIXCO paid certain contract proceeds to McKown Construction Co. ("McKown Construction") despite having notice that Bank's debtor, Bill G.

McKown ("McKown"), had previously pledged those proceeds as security for McKown's line of credit with Bank [1].

The trial court found that (1) there was no substantial controversy that an agreement existed between Bank and McKown that Bank have a security interest in the proceeds; and (2) an April 23, 1985, confirming letter from McKown to Bank was sufficient to meet Oklahoma statutory requirements for a security agreement. The court granted judgment against OFIXCO and McKown Construction for $159,128 in principal and more than $65,000 in prejudgment and postjudgment interest.

The record reveals that in July 1984 McKown signed a promissory note to Bank to be used as a line of credit. In April 1985, he met with Bank officer Elvis Howell to request an additional $100,000 draw on the line. McKown agreed to assign to Bank as additional collateral his contract rights under the McKown Construction/OFIXCO contract. McKown confirmed the agreement in his April 1985 letter to Howell, stating in part:

> Per our conversation today, I am enclosing a copy of our draw applications to Oklahoma Fixture Company on the Shilitos–Rikes project to be use [sic] as collateral on our line of credit. . . .

A copy of the draw request was attached to the letter, which was signed by McKown.

From April 23 to April 30, 1985, Bank disbursed approximately $72,709 to McKown. On May 1, 1985, Bank notified OFIXCO by letter of the transaction and that OFIXCO's payments should be sent to Bank made "payable jointly" to McKown Construction and Bank. Clarence Jones, an OFIXCO officer, signed a statement at the bottom of Bank's letter acknowledging receipt and agreeing to make payments as directed, and returned it to Bank.[2]

On May 6, 1985, Bank forwarded to McKown copies of a form security agreement and two financing statements for signature. That letter included a copy of the notice to OFIXCO. McKown never signed or returned the forms. From May 7 to June 19, 1985, Bank disbursed another $253,000.

In his deposition McKown admitted his April 23 letter accurately described his conversation with Howell. McKown also testified that "subsequently . . . we had some turn of events that it wasn't advantageous for us to fulfill that agreement." He never notified the Bank of his change of mind. While McKown has never denied having an agreement with the Bank, he has denied making a *written* "assignment" of his contract rights. Some time after OFIXCO had returned the notice letter to Bank, Jones asked McKown whether OFIXCO could go ahead and pay the contract proceeds to the Bank as required by the letter. McKown told OFIXCO not to pay the Bank and indicated he would sue if OFIXCO did so; OFIXCO paid McKown Construction directly.

In its answer on file in the case, OFIXCO claimed its consent was "fraudulently obtained" by Bank and of no effect. No specific acts of fraud were alleged or proved. In response to Bank's summary judgment motion, OFIXCO described the "sole issue" as being whether McKown signed a security agreement meeting the requirements of 12A O.S.1991 § 9–203(1)(a). OFIXCO also claimed that McKown's denial of a written assignment, Bank's forwarding of form documents to McKown, and the fact that Bank alleged an "oral agreement" with McKown in its petition in the case show no security agreement was intended. OFIXCO now alleges as error that factual issues exist regarding the parties' intent, and challenges the trial court's finding that McKown's April 23 letter is a sufficient writing under Article 9 of Oklahoma's Uniform Commercial Code, 12A O.S.1991 §§ 9–101 through 9–507.

---

1. Bank's foreclosure claims involving mortgages of real property held by Central Bank and Trust of Tulsa were settled by agreed journal entries of judgment filed in September 1987 and June 1988.

2. In the trial court Jones submitted an affidavit explaining that he misunderstood what he was signing when he signed the letter and returned it to Bank.

When a summary judgment has been granted, an appellate court must examine the pleadings and evidentiary materials. If the record discloses either controverted material facts, or if the uncontroverted facts support legitimate inferences favoring the well-pled theory of the party against whom the judgment was granted, the judgment will be reversed. *First Nat. Bank and Trust Co. v. Kissee,* 859 P.2d 502 (Okla.1993); *Northrip v. Montgomery Ward & Co.,* 529 P.2d 489 (Okla.1974); *Perry v. Green,* 468 P.2d 483 (Okla.1970). When the movant has shown there is no genuine issue as to a material fact, however, the opposing party cannot merely rely upon conjecture or suggest that "facts might exist" to justify trial. *Kissee,* 859 P.2d at 505. Summary judgment should be granted when it appears one party is entitled to judgment as a matter of law. *Flanders v. Crane Co.,* 693 P.2d 602 (Okla. 1984).

Under 12A O.S.1991 § 9–102(1), Article 9 of the U.C.C. governs any transaction, "regardless of its form," intended to create a security interest in personal property. Under section 9–102(2), Article 9 applies to "security interests created by contract," including pledges and assignments. Requirements for an enforceable security interest are described in section 9–203(1):

> [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
>
> (a) the collateral is in the possession of the secured party ... or the debtor has signed a security agreement which contains a description of the collateral ...;
>
> (b) value has been given; and
>
> (c) the debtor has rights in the collateral.

Section 9–318(3) governs notification to account debtors, such as OFIXCO, of assignments of accounts and contract rights [3]. The Oklahoma Supreme Court has held section 9–318(3) "establishes a duty upon an account debtor" to pay the assignee upon the account debtor's receipt of notice of the assignment. *American Bank of Commerce v. City of McAlester,* 555 P.2d 581, 585 (Okla.1976). There, the court held defendant breached that duty when, after receiving notice, it failed to pay the assignee based on its erroneous belief the assignment was invalid. *Id.* at 586–87.

Here, the requirements of sections 9–203(1)(b) and (c) are not in dispute, nor does OFIXCO deny it received Bank's notice. Rather, OFIXCO asserts a factual dispute over the parties' intent and a legal dispute as to the sufficiency of McKown's April 1985 letter as a "security agreement" under section 9–203(1)(a).

Oklahoma law clearly looks to intent as controlling over form in creation of security interests. *See* 12A O.S.A. § 9–102, comment 1 (West 1963); *Georgia–Pacific Corp. v. Lumber Prod. Co.,* 590 P.2d 661, 664–65 (Okla.1979). When the parties' intent and the terms of a contract are clear, however, construction and interpretation of the contract present a matter of law. *See Cook v. Oklahoma Bd. of Pub. Affairs,* 736 P.2d 140, 145 (Okla.1987); *Gragg v. James,* 452 P.2d 579, 587 (Okla.1969). Matters of law may be considered *de novo* by this court. *Salve Regina College v. Russell,* 499 U.S. 225, 231–32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

Contrary to OFIXCO's suggestion, the facts relevant to determining intent in this case are not disputed, and OFIXCO's argument that the facts lend themselves to different reasonable interpretations is not substantiated by the proof. The facts lead to only one reasonable conclusion: McKown and the Bank agreed orally that the OFIXCO contract proceeds would stand as collateral for McKown's loan. This is the clear tenor of

**3.** An account debtor may pay an assignor "until the account debtor receives notification that ... payment is to be made to the assignee." However, "[i]f requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made, and unless he does so, the account debtor may pay the assignor." 12A O.S.1991 § 9–318(3). It is undisputed that OFIXCO never made such a request from Bank.

McKown's deposition testimony[4] and of his April 1985 letter, which clearly evidences McKown's intent that the Bank immediately use the draws from the OFIXCO contract as collateral.

Bank's allegation in its petition of an oral assignment and McKown's denial of a formal written "assignment" do not raise doubt as to what the parties intended; rather, those items simply reflect what actually appears to have occurred. The fact that Bank later submitted form documents to McKown does not detract from the undisputed evidence of an agreement in fact between those parties previously, any more than does McKown's later unilateral change of mind. We thus agree with the trial court that there is no substantial dispute that an agreement existed between the Bank and McKown.

■ The enforceability of the agreement requires us to examine 12A O.S.1991 § 9–203(1) and determine whether McKown's letter is sufficient as a security agreement as a matter of law.

The U.C.C. defines "security agreement" as "an agreement which creates or provides for a security interest." 12A O.S.1991 § 9–105(1)(*l*). Comment 1 to section 9–203 as originally enacted notes that although the agreement "[t]ypically ... will contain much more" the only formal requirements for an enforceable security interest are:

(a) a writing;

(b) the debtor's signature; and

(c) a description of the collateral or kinds of collateral.

12A O.S.A. § 9–203, comment 1 (West 1963).

Unfortunately, the parties do not cite and we do not find guidance from the Oklahoma Supreme Court directly on point. Cases from the federal courts, the Oklahoma Court of Appeals and other jurisdictions vary as to the degree of formality required.

The extremes are illustrated in the cases of *In re Numeric Corp.*, 485 F.2d 1328 (1st

Cir.1973) and *In re Taylor Mobile Homes, Inc.*, 17 U.C.C.Rep.Serv. (Callaghan) 565, 1975 WL 22814 (Bankr.E.D.Mich.1975). In *Numeric*, the First Circuit found that a signed financing statement combined with a board of directors' resolution satisfied U.C.C. requirements. Interpreting a statutory provision identical to Oklahoma's, the court said:

> [W]e have little difficulty concluding that a separate formal document entitled "security agreement" is not always necessary to satisfy the signed-writing requirement of § 9–203(1).... The draftsmen of the U.C.C. ascribed two purposes to that requirement. One ... was evidentiary, to prevent disputes as to precisely which items of property are covered ... The second ... is to serve as a Statute of Frauds, preventing the enforcement of claims based on wholly oral representations.... *A writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it.*

*Id.* at 1331 (emphasis added) (citations omitted). *See also Personal Jet, Inc. v. Callihan*, 624 F.2d 562 (5th Cir.1980); *Grover v. United California Bank (In re Nunnemaker Transp. Co., Inc.)*, 456 F.2d 28 (9th Cir.1972); and *Wyhy Fed. Credit Union v. Burchell*, 643 P.2d 471 (Wyo.1982).

The extreme on which OFIXCO relies is illustrated by *In re Taylor Mobile Homes*, where the bankruptcy judge refused to construe a financing statement and promissory note (which contained language indicating it was secured by certain collateral) as a security agreement. The court found the lender was "under the impression" that a security agreement had been signed; thus, the court held the bank had not intended for the note and financing statement to constitute the security agreement. 17 U.C.C.Rep.Serv. at 569.

---

**4.** Bank's claim that parol evidence is not admissible with regard to the April 1985 letter is misplaced in light of Bank's failure to object to the evidence in the trial court and Bank's own reliance upon such evidence in support of its motion.

The court in *Taylor* relied on a 1972 Tenth Circuit case, *Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700 (10th Cir.1972) (interpreting Oklahoma law), in which the court concluded that an enforceable security agreement required language which "specifically creates or grants a security interest in the collateral described." *Id.* at 703. The appeals court recognized that there were no "magic words" needed to create the security interest, but that the instrument had to be worded so it "leads to the logical conclusion" that a security interest was intended. *Id.* In *Pontchartrain State Bank v. Poulson*, 684 F.2d 704 (10th Cir.1982), the court again interpreted Oklahoma law and again held that a promissory note which only vaguely described the collateral combined with a letter from the debtor's attorney were not sufficient. Significantly, however, the only reason given by the court for finding the letter insufficient was that it was signed by debtor's counsel rather than by the debtor or its agent. *Id.* at 706–07. Presumably, the majority would have found the letter sufficient had the debtor himself signed; in fact, Judge Logan, in a concurring opinion (on other grounds) felt that debtor's counsel was an agent, and that counsel's signature fulfilled section 9–203(1)(a) requirements. *Id.* at 708.

Most recently, the Oklahoma City Division of the Court of Appeals held that two loan contracts were sufficient as security agreements even though they did not contain specific "words of grant." *Economy Fin. Agency v. Stickney*, 738 P.2d 1386, 1388 (Okla.Ct. App.1987). The contracts were signed by the debtor and contained language which described the collateral and stated the lender retained a security interest. The court noted the Tenth Circuit's holding in *Shepherd Mall* that "no magic words" of grant are required

and held that "[t]he public policy of this state" as reflected in the U.C.C. "is to move away from archaic legalisms and reduce formal requirements to a bare minimum." *Id.*

Applying the foregoing to this case, we hold that McKown's letter is sufficient to stand as the writing required by 12A O.S. 1991 § 9–203(1)(a). The letter confirms that the parties conferred and agreed that the contract draws would be used as additional collateral; it explicitly describes the collateral; and it is signed by the debtor. Section 9–203 requires no more.

We do not here intend to condone haphazard and careless banking practices. OFIXCO argues that public policy against such practices and the "inadvertent" creation of security interests precludes the letter from functioning as a security agreement. Though the argument is persuasive, it is misplaced here, where OFIXCO itself played a part in procuring the Bank's disbursement of proceeds. By signing and returning its consent to pay Bank as requested—even if by mistake—OFIXCO could only have reinforced Bank's understanding that its secured status was not in question. OFIXCO had several other potential remedies available to it—including but not limited to an interpleader action—besides simply paying McKown Construction without regard to Bank's claim. As such, it should not now be heard to complain that Bank's purported paperwork deficiency should somehow excuse OFIXCO's breach.

■■■ The trial court's judgment is AFFIRMED.[5]

STUBBLEFIELD, J., concurs.

BRIGHTMIRE, J., dissents.

---

5. A final issue raised by OFIXCO—that determination of the effect of the McKown letter is worthy of a full trial with live witnesses, even though jury trial was waived—was not raised in the trial court, and shall not be heard now. *See McMillan v. Lane Wood & Co.*, 361 P.2d 487 (Okla.1961); *Ross v. Thompson*, 174 Okla. 183, 50 P.2d 385 (1935). We note that Oklahoma law precludes a party resisting a motion for summary judgment from relying on evidence on appeal that was not before the trial court. *Kissee*, 859 P.2d at 505. OFIXCO named only one witness—Bill McKown—in the pre-trial conference order in the case. OFIXCO submitted no affidavits by bank officers or other experts, nor did it submit the affidavit allowed by District Court Rule 13(d). Several years have passed since this case was filed, and there has been ample time for OFIXCO to build the evidence necessary to defend its case.

BRIGHTMIRE, Judge, dissenting.

I am unable to concur in affirming the summary judgment granted in this case.

Title 12A O.S.1991 § 9–203(1)(a), reads in pertinent part as follows:

"... *a security interest is not enforceable against* the debtor or third parties with respect to the collateral *and does not attach unless:*

   (a) ... *the debtor has signed a security agreement* which contains a description of the collateral.... [6]

It is uncontroverted that McKown never signed a written security agreement. In its petition, filed December 6, 1985, Bank seeks recovery from OFIXCO of certain money—which in April 1985 OFIXCO owed to McKown—based on McKown's "oral agreement with Plaintiff," by which McKown "assigned Plaintiff a security interest in [McKown's] accounts and contracts receivable." Bank further alleged that "Defendant, OKLAHOMA FIXTURE COMPANY, was notified of this [oral] assignment by a letter from Plaintiff dated May 1, 1985" and that OFIXCO "acknowledged receipt of said letter and agreed to make payment as directed to the Plaintiff." Bank does not mention written evidence of a security agreement of any kind in its petition.

As the majority points out, Bank sent a written security agreement to McKown for his signature on May 6, 1985. McKown never signed it.

The court can judicially notice that it is very unusual for a bank to advance money, particularly a substantial amount, solely on the basis of an oral promise or commitment of the debtor to repay, secured by an oral promise to sign a mortgage or, as in this case, sign a security agreement assigning certain receivables. Moreover, it is not clear just what, if any, funds Bank released on the basis of the oral OFIXCO receivable assignment. This is because Bank had already granted McKown a $500,000 line of credit

secured by a real estate mortgage. The OFIXCO official filed an affidavit saying he thought he was merely acknowledging receipt of the May 1, 1985, letter. And when OFIXCO told McKown—who incidentally had been a member of Bank's board of directors—about the letter, McKown said he had not signed any security agreement and if OFIXCO paid the money owed to him to Bank he would sue OFIXCO. Under these circumstances OFIXCO paid the money to McKown, who a short time later filed a chapter seven bankruptcy petition. Bank then filed this lawsuit against McKown and Central Bank and Trust Company of Tulsa (formerly Republic Bank) seeking, in its first cause of action, foreclosure of a mortgage McKown had given on a piece of property to secure the $500,000 line of credit; and in its second cause of action a judgment against OFIXCO for the money the latter owed and paid to McKown on the Shilitos–Rikes receivable.

In September 1988, Bank moved for a summary judgment against OFIXCO stating, among other things, that "[a]t the request of the bank, Mr. McKown pledged additional collateral [to secure the $500,000 line of credit] assigning the proceeds of his contract rights for certain ... work being done for Oklahoma Fixture company ('OFIXCO')." Bank further stated that "[o]n April 23, 1985, McKown sent a copy of a draw application that he ... was assigning to the bank" and attached a copy of the letter. It reads:

April 23, 1985

Elvis Howell
First National Bank of Stillwater
P.O. Box One
Stillwater, OK 74077

Dear Elvis:

Per our conversation today, I am enclosing a copy of our draw applications to Oklahoma Fixture Company on the Shilitos–Rikes project to be use [*sic*] as collateral on our line of credit. In talking with you,

6. Emphasis added.

John and I told you a wrong figure which we discovered after I hung up. I believe I told you approximately $300,000. when in fact the figure is approximately $200,000., I apologize, but we looked at the wrong draw request.

John called our insurance agent on the house in Rambling Oaks, he is to send us another insurance certificate with the amount insured on it. We will forward it as soon as we receive it.

Elvis, I hope this is all the information that you needed, if not please do not hesitate to contact John or myself. Thank you for your assistance.

Sincerely,

McKown Industries, Inc.
/s/
Bill G. McKown
President

BGM/sam

Enclosures:

Attached to the letter was a copy of an application numbered 10 dated April 25, 1985, entitled "Contractor's Application for Payment."

This motion for judgment was overruled December 12, 1988.·

A second motion for summary judgment was filed November 21, 1991. The same exhibits were attached and in addition Bank attached some deposition testimony that had been taken. There was also an affidavit of Bank's president which referred to a $500,-000 promissory note executed by McKown in July 1984 with respect to which the controversial OFIXCO receivable was to, according to Bank, become additional collateral. The affidavit itemized disbursements by Bank to McKown between April 23, 1985, and June 19, 1985, in the total sum of $325,709.23. It also itemized payments by McKown between April 23, 1985, and May 23, 1985, in the total sum of $306,839.19. And then, in the final paragraph, the president said the plaintiff bank "would not have allowed advances by the borrower in excess of a total of $250,000 except that the borrower provided additional collateral in the form of an assignment of the Shilitos–Rikes project contract with Oklahoma Fixture Company."

It is on the basis of the McKown April 23 letter and the April 25 application for payment attached to it—that the trial court concluded were "[a]s a matter of law ... sufficient to meet the statutory requirements for a valid security interest," and therefore granted Bank a summary judgment against OFIXCO for $159,128, plus prejudgment interest in the amount of $64,940.36, for a total of $224,068.36 which will accrue post-judgment interest of 9.58 percent per annum until paid.

In my opinion the judgment is not only unjust and unfair it is contrary to law according to my perception of the uncontroverted facts relied upon by the movant Bank. And the reason for this is that I do not agree that our rules of document construction will permit a judicial metamorphosis of McKown's April 23 informational letter into a signed agreement granting Bank a security interest in McKown's account receivable from OFIXCO. At the very least there exists a question of fact as to what McKown meant and intended by the language he used in his April 23 letter.

The term "security agreement" is defined in 12A O.S.1991 § 9–105(1)(*l*) as "an agreement which creates or provides for a security interest." Subject letter is not an agreement and does not create or provide for a security interest. In a most liberally read light all the epistle says is that to correct misinformation McKown gave "Elvis" earlier during a discussion about collateral, McKown was enclosing a copy of his company's request for payment for work completed on the Shilitos–Rikes project. Thus, all the letter means to me is that McKown and Elvis had talked earlier about McKown signing an assignment of the OFIXCO receivable and information was needed as to how much was due or expected on the Shilitos–Rikes contract and because McKown had given Elvis some in-

correct figures he was sending the draw application to confirm the corrected collateral figures to be used in preparing appropriate documents for execution. For to construe the letter otherwise one would have to say that the term "draw application" means "account receivable" and this gaping abyss I am unable to logically, grammatically or legally bridge. In other words, I cannot equate D telling B the amount he has requested obligor C to pay D, with D telling B that he grants to B an interest in receivables which obligor C owes or will owe D on a certain contract.

The UCC provides a very simple procedure to be followed by a lender to perfect an enforceable security interest agreement— one, incidentally, which is a basic attribute of sound business practice—namely, get it in writing. And, of course, the reason for this is to avoid the very type of controversy which has arisen here.

It is not persuasive for the president of a bank to swear at this late date, as he did in his affidavit, that the bank would not have advanced the borrower in excess of $250,000 unless the borrower had provided "additional collateral in the form of an assignment of the Shilitos–Rikes project contract with Oklahoma Fixture Company," [7] because of the admitted fact that it actually did make such an advance knowing that to enforce a non-held collateral it had to have a written security agreement signed by the borrower.

Nor do I believe that OFIXCO's signing of the letter sent by Bank somehow breathes enforceability into an oral assignment of collateral.

The majority refers to what it calls the extremes of relevant cases in point. In my opinion the facts here are even less sufficient than those in the cases cited by the majority as being at the rejection extreme, e.g., Mitchell v. Shephard Mall State Bank, 458 F.2d 700 (10th Cir.1972) (interpreting Oklahoma

law). And, certainly, subject facts fall far short of those said to sufficiently comply with the requirements of § 9–203. For instance, In re Numeric Corp., 485 F.2d 1328 (1st Cir.1973), holds it was sufficient compliance with the UCC where a loan to the Numeric Corporation from Russell Blank was secured by (a) an executed promissory note; (b) a formally adopted resolution at a special meeting of the directors held April 13, 1962, which directed the clerk to prepare UCC-conforming "financing statements" on behalf of corporation to "Russell Blank," as secured creditor in such a manner and form as to cover Russell Blank's security interest in the property of the corporation as set forth in a Bill of Sale dated March 2, 1962, "and the resolution authorized the treasurer to execute and deliver the documents to Blank"; and (c) the delivery of the promissory note to Blank on the same day a financing statement, which referred to Blank as the "secured party" and listed the property in the Bill of Sale as the property covered by the statement, was filed of record—June 15, 1962.

On June 26, 1963, Numeric was adjudged a bankrupt.

Unlike the case sub judice, Numeric involved some written documents created by the debtor which at least purported to expressly grant a security interest in the specifically described collateral—the criterion established by the Tenth Circuit interpreting Oklahoma law.[8]

The same thing is true with respect to the facts in Economy Finance Agency v. Stickney, 738 P.2d 1386 (Okl.App.1987). There it was held that the security agreement requirements of § 9–203(1) were satisfied by the debtor's execution of two loan contracts, each of which contained a description of the collateral, and the value given along with this critical notation: " 'You are giving a security interest in the property' and 'The lender retains a security interest in the subject of

---

7. I presume the president means assignment of McKown's "receivable" as distinguished from the "contract."

8. Mitchell v. Shepherd Mall State Bank, 458 F.2d 700 (10th Cir.1972).

this agreement', the listing of collateral, together with the UCC–1 and the endorsement of lien on the Certificate of Title for the pick-up ...'"

In the case sub judice we have nothing even close to or resembling the facts underlying the *Numeric* or *Mitchell* holdings.

I would therefore reverse the summary judgment and remand for further proceedings.